## UNITED STATES DISTRICT COURT

## DISTRICT OF CONNECTICUT

| | |
|---|---|
| ROSA ("ROSE") STILLO, | CIVIL ACTION NO.: |
| Plaintiff, | |
| | March 11, 2022 |
| v. | |
| | **JURY TRIAL DEMANDED** |
| WALGREEN PHARMACY SERVICES MIDWEST, LLC | |
| Defendant. | |

## <u>COMPLAINT</u>

The Plaintiff, Rosa Stillo, for and as her Complaint, alleges upon personal information as to her own actions and interactions, and upon information and belief as to all other matters, as follows:

## <u>PARTIES</u>

1.     The Plaintiff is Rosa Stillo, also known as Rose Stillo (hereinafter "Stillo"), who resides at 63 Revere Lane in Fairfield, Connecticut.

2.     The Defendant, Walgreen Pharmacy Services Midwest, LLC (hereinafter, "Walgreens") employs more than twenty employees.

3.     Walgreens is incorporated in the State of Illinois, duly licensed to do business in the State of Connecticut having a principal place of business located at 108 Wilmot Road, Deerfield, Illinois.  Walgreens employs more than twenty (20) employees in the State of Connecticut, and therefore is subject to both federal and state statutes relating to discrimination, retaliation, and medical leave, including, *inter alia*, the Connecticut Fair Employment Practices Act (the "FEPA") C.G.S. § 46a-60 *et seq.*, the anti-retaliation provisions of the Age Discrimination in Employment Act, 29 U.S.C. §§ 621-634 (the

"ADEA"), the anti-retaliation and anti-interference provisions of the Connecticut Family and Medical Leave Act (the "CT FMLA"), the anti-retaliation and anti-interference provisions of the Conn. Gen. Stat. §35-61pp and the Family and Medical Leave Act, 29 U.S.C. § 2601, *et seq.* (the "FMLA").

4.      As an employer in the State of Connecticut, Walgreens is also subject to liability for violating its statutory obligation to provide an employee a copy of her personnel file within ten (10) business days of receiving a signed written request for such materials, pursuant to Conn. Gen. Stat. § 31-128b(b).

## JURISDICTION

5.      On September 22, 2021, Stillo dual-filed a complaint with the Connecticut Commission on Human Rights and Opportunities ("CHRO") and with the United States' Equal Rights and Opportunities Commission ("EEOC"), alleging (i) adverse employment actions including unjustified discipline and wrongful termination in retaliation for reporting an objectively good faith belief that she suffered age discrimination while employed at Walgreens in violation of the FEPA and the ADA; and (ii) interference with and retaliation for exercising, her right to seek medical leave due to a disabling condition of stress-related migraine headaches in violation of the CT FMLA and the FMLA.

6.      Stillo timely dual-filed an administrative charge with the CHRO and the EEOC on September 22, 2021, which was fewer than 180 days of the most recent unlawful conduct by Walgreens against Stillo.

7.      Stillo was awarded a Release of Jurisdiction ("ROJ") from the CHRO, on December 16, 2021.  A true and correct copy of the ROJ notice letter is attached hereto as **Exhibit 1.**  The EEOC issued a right-to-sue letter to Stillo  on January 13, 2022.  A true

and correct copy of the right to sue letter is attached hereto as **Exhibit 2.**  Accordingly, Stillo has exhausted her administrative remedies with respect to both her federal and statutory claims.

8.      This Court has subject matter jurisdiction over the federal statutory claims under 28 U.S.C. § 1331 and 1342, and supplemental jurisdiction over the related state claims pursuant to 28 U.S.C. § 1367.

9.      The District of Connecticut is the proper venue for this dispute under 28 U.S.C. § 1391(b), since a substantial part of the events and omissions giving rise to the clams alleged herein occurred in this judicial district, and since the majority of the witnesses and evidence are located in this judicial district.

## STATEMENT OF FACTS

### A.  Introduction

10.     After 30 years of devoted service as a Walgreens employee, and after 15 years as the trusted manager of the Walgreens Pharmacy in Westport, Connecticut, Stillo had developed a good faith and objectively reasonable belief that Walgreens had a pattern of fabricating discipline against employees in their 50s and 60s, in order to justify terminating them, or to force them to quit or retire.

11.     Stillo developed this belief after her supervisors made her the target of a series of unwarranted disciplinary action that were neither consistent with Walgreens' Progressive Discipline Plan, nor imposed against younger employees who engaged in the same conduct that allegedly gave rise to the discipline instituted against Stillo.

12.     Stillo engaged in the protected activity of making a written report putting Walgreens on notice of her belief that Walgreens was engaged in unlawful age

3

discrimination against older employees, including herself, to her supervisors, and revealed that she was consulting with an attorney to discuss whether her claims had merit.

13.     In response, Walgreens put Stillo on an unpaid suspension, a negative employment action that was in apparent retaliation for making a complaint about systemic and pervasive age discrimination at Walgreens, in violation of state and federal law.

14.     The stress of being placed on unpaid leave triggered stress-related migraines in Stillo, who suffers from chronic migraine headaches.  On July 1, 2021, Stillo submitted an application to take a medical leave of absence to obtain medical treatment.

15.     Walgreens terminated Stillo on July 6, 2021, five days after she submitted her application for a medical leave of absence, then backdated Stillo's termination date in its records to June 29, 2021, two days *before* she applied for disability leave.

16.     On July 12, 2021, Stillo received an email stating that her application was denied because Walgreens' records indicated that she had been terminated *before* submitting the application.

17.     Upon information and belief, Walgreens falsely back-dated Stillo's termination date for the express purpose of preventing her from going on protected disability leave, despite being on notice that she suffered from a chronic migraine condition.  This conduct was in violation of the the non-retaliation and non-interference provisions of the ADEA, the CT FMLA, and the FMLA.

18.     Finally, in violation of Conn. Gen. Stat. § 31-128b(b), Walgreens failed to provide a copy of Stillo's personnel file within 10 days after receiving a written request for a copy of that file and a signed authorization from Stillo, on August 11, 2021. It did not

provide a copy of Stillo's personnel file upon receipt of her CHRO complaint, which contained an allegation that the failure to produce that file was a statutory violation.

**B. Background as to Stillo's Employment with Walgreens**

19.     Stillo began her employment as a Pharmacist with Walgreens in Illinois in 1991.  She remained employed at various Walgreens Pharmacy locations in Illinois, and Connecticut until July 6, 2021, when she was terminated.

20.     In approximately 1995, Stillo was promoted to Pharmacy Manager in Illinois.  When she relocated to Connecticut, she once again attained this title in 2001, and she remained a Pharmacy Manager until the date of her termination.

21.     Stillo was a devoted employee, spearheading the operations of several Walgreens Pharmacy retail locations until 2004 when the location at 880 Post Road East in Westport, Connecticut (hereinafter the "Westport Pharmacy") opened under her supervision.  Stillo remained the Pharmacy Manager of the Westport Pharmacy from its 2004 opening until July 6, 2021, when she was terminated.

**C. A 2013 Walgreens Policy Change Led to an Inherent Contradiction in the Chain of Command Between the Pharmacy Manager and the Store Manager**

22.     In her capacity as Pharmacy Manager, Stillo was responsible for ensuring the regular safe and efficient operations of the Pharmacy, including the accurate filling of prescriptions, adherence to pharmacy regulations, adherence to Walgreens' policies and procedures, and ensuring the safeguard and maintenance of customer data and information.

23.     On average, Stillo supervised approximately one to three Pharmacy Technicians during each of her shifts.

24.    Until approximately 2013, Stillo reported to a Pharmacy Supervisor, who was a licensed pharmacist.  Each Pharmacy Supervisor supervised the Pharmacy Managers at 15-20 stores within each Walgreens Pharmacy district.  That Pharmacy Supervisor also addressed any disciplinary issues that arose within the Pharmacy itself that could not be resolved by the Pharmacy Manager.

25.    During the time that she was supervised by a Pharmacy Supervisor who was also a licensed pharmacist, and who therefore understood the personnel needs and operational difficulties of a busy retail pharmacy, Stillo was never discipline under Walgreens' Progressive Discipline Policy (hereinafter the "PDP").

26.    However, in approximately 2013, Walgreens changed the structure of the chain of command within its retail pharmacies such that the Pharmacy Manager no longer reported to a licensed pharmacist, but rather to a Store Manager, who also managed the retail operations *outside* the pharmacy at each Walgreens location.

27.    Store Managers were *not* licensed pharmacists.  Therefore, the Pharmacy Managers no longer reported to supervisors who understood the needs of a pharmacy from both a retail and a regulatory standpoint.

28.    Though the Store Manager's main responsibility was supervising the retail operations of the store and the Pharmacy, the Store Manager had an *additional role*:  to be a Pharmacy Technician *within* the Pharmacy when the Pharmacy was not sufficiently staffed.  During the time that the Store Manager was performing Pharmacy Technician duties, therefore, the Store Manager was technically simultaneously *both* the Pharmacy Manager's supervisor as to retail operations, but was also supervised *by* the Pharmacy Manager insofar as Pharmacy Technicians were supposed to fill prescriptions, make calls

6

to customers about their prescriptions, and comply with all policies, standards, and regulations that govern a retail pharmacy.

**D. An Initial Attempt to Fabricate Discipline Against Stillo was Deemed by Walgreens to be Meritless**

29.     In 2019, a Store Manager named Michelle Haydu fabricated discipline against Stillo for a minor incident and issued her a Final Written Warning ("FWW"), but Stillo provided Human Resources copies of text messages from Haydu that proved that multiple statements in the FWW were false.

30.     As a result of Stillo's factual statements, Human Resources expunged the FWW from Stillo's file.

31.     Shortly thereafter, Haydu was transferred to another Walgreens retail store, but upon information and belief, she received no discipline and was not terminated for falsifying disciplinary documents.

32.     Haydu was replaced as Store Manager by Steven Dillon.

33.     Dillon appeared to feel that Stillo's tenure in the Store undermined his authority.  He also seemed to resent that she felt comfortable alerting him to the fact that he often underperformed in his responsibilities as a Pharmacy Technician, including failing to call customers about un-retrieved prescriptions (known as "adherence calls"), his failure to perform in his role as a Pharmacy Technician during the first two hours of many shifts (a practice known as "CODE GREENS,") and, toward the end of Stillo's employment, calling out his failure to perform COVID vaccinations, as many Pharmacy Technicians were required to do after becoming trained to do so in the early months of 2021.

34.     Dillon would seek to assert his authority over Stillo by regularly nitpicking her behavior in a confrontational way in an attempt to trigger her temper, despite the fact that Stillo's conduct was in conformity with Walgreens policies and her professional obligations as a pharmacist.

35.     In fact, because of the friction between their roles, Dillon and Stillo often had conflicted conversations, with each of them raising their voices to the other on a regular basis. These disagreements were so frequent and unremarkable that another employee, Lynn Raytar, would occasionally comment that they bickered "like a married couple."

36.     Neither Dillon nor Stillo was ever disciplined for insubordination as a result of these episodes of raised voices, and this type of interaction became accepted by their colleagues as simply part of their working relationship.

**E. Stillo Continued to Perform Her Duties, and Cover for Dillon's Shortcomings, Despite the Stress of the Pandemic**

37.     In 2020, the COVID-19 pandemic began, and like other front-line workers, Stillo had to go to work under unprecedented stressful conditions, and her migraine symptoms began to increase in severity.

38.     During the time between March 2020 and February 2021, Stillo had to confront regular staffing shortages in the Westport Pharmacy, often filling in when Pharmacy Technicians had to quarantine or refuse to come in due to the high-risk nature of working with the public during a pandemic.

39.     As a result of these difficult conditions, the already fast-paced work environment at the Westport Pharmacy became even faster paced and more stressful,

forcing all the employees to deal with each other's loss of temper under stress on an increasingly regular basis.

40.     Stillo continued to work long hours and show up faithfully for work so that her customers could receive their medications, even in the summer of 2020 when the stressful pandemic conditions blended with the stress of the prolonged power outages caused by Tropical Storm Isaias.

**F.   Dillon and Andolfo Unfairly Retaliate Against Stillo for Having Exercised Her Managerial Authority over a Pharmacy Technician**

41.     On or about February 26, 2021, a Pharmacy Technician, Dominique Liggins claimed to be having a panic attack with a racing heart because of a personal problem she was experiencing outside of work.

42.     Stillo, who had been successfully managing Liggins as her direct supervisor for years, and who was familiar with the personal problems Liggins was experiencing, was notified at home that Dillon intervened that morning and called an ambulance for Liggins after speaking to her in her car. Dillon never notified Stillo of what was happening.  Despite the fact that Stillo was now short-handed for her afternoon shift, Dillon went home early.

43.     That evening, Dillon sent Stillo a text message confirming that he knew that Liggins had not actually been ill and stated, "Between us its [*sic*] man trouble and not her heart."

44.     Nevertheless, on or about March 1, 2021, when Stillo questioned Liggins about the episode, Liggins began to raise her voice and became very defensive.  She screamed in anger, now with Dillon present.

45.     Dillon did not intervene, nor did he enforce any part of the Walgreens' PDP against Liggins, even though Liggins was not conducting herself appropriately toward Stillo.

46.     Stillo explained her side of the story, and informed Dillon that he should have counseled Liggins for raising her voice to Stillo, rather than reprimanding Stillo for managing a Pharmacy Technician whose feigned illness had negatively impacted pharmacy staffing levels.

47.     In a transparent attempt to avoid the consequences of her actions, Liggins then requested a leave of absence, which was granted by Dillon, and subsequently transferred to another Walgreens store.

48.     Approximately a week later, on March 8, 2021, Stillo was summoned to a meeting with Dillon and his own supervisor, District Manager Matthew Andolfo.

49.     During that meeting, Dillon and Andolfo accused Stillo of behaving inappropriately despite the fact that they had been aware that she was not really ill.  Stillo found herself defending her actions as Liggins' manager to Dillon and Andolfo, pointing out that Dillon's text messages demonstrated that the entire incident was not due to illness.

50.     Two months later, on May 20, 2021, Dillon and Andolfo approached Stillo again, unannounced. They showed Stillo the statistics for the Westport Pharmacy, stating that the Westport Pharmacy was behind on so-called "adherence calls," which are calls to customers regarding their un-retrieved medications.

51.     However, per Walgreens' policy, while the Pharmacy Manager is responsible for ensuring the orderly operations of the Pharmacy, the regular performance of the adherence calls is among the daily responsibilities of the Pharmacy Technicians.  In

fact, as Store Manager, *it was Dillon's responsibility* to perform the duties of Pharmacy Technicians when other Pharmacy Technicians are overwhelmed or not onsite to perform those calls.

52.     Although it was not forbidden for a Pharmacy Manager to aid in performing technician adherence calls, it was also not usually possible for a Head Pharmacist to perform that task while safely performing their other duties, due to the volume of prescriptions that each Walgreens pharmacy had to fill each day.

53.     Stillo pointed out to Dillon and Andolfo that keeping up with adherence calls was the responsibility of the Pharmacy Technicians, including Dillon himself.  She pointed out to Dillon and Andolfo that if workload prohibits the pharmacy staff from executing these adherence calls safely, then Dillon himself could perform the technician calls ensuring the accuracy of the prescriptions filled at the Westport Pharmacy.  Thus, Stillo made these recommendations to her managers on how to improve the statistics of the Westport Pharmacy in a good faith attempt to work with her managers.

54.     Dillon continued to chastise Stillo for failing to perform duties that were in fact the responsibilities of Dillon himself, along with other Pharmacy Technicians.  Dillon refused to listen to any of Stillo's recommendations. However, at no point did either Dillon or Andolfo tell Stillo that she was being disciplined, nor did either of them mention that the meeting was part of any discipline under the PDP.

55.     When Stillo returned to work for her next shift, Dillon ostracized and isolated her, and this conduct continued consistently for the remainder of Stillo's employment at the Westport Pharmacy.  He rarely spoke to her, and he refused to enter the pharmacy to perform his responsibilities as a Pharmacy Technician in the first two hours

of the 9 a.m. to 9 p.m. shift, which was one of his duties as Store Manager.  This long-standing practice at a Walgreens pharmacy is so routine that it has its own name and is known as a "CODE GREEN."

56.     Stillo experienced continuous stress during this time because of the emotional discomfort she was in while being ostracized and having to ensure that Dillon's responsibilities were covered during this period, since he would not enter the Westport Pharmacy to perform his duties when Stillo was working.  The stress manifested itself most notably in a marked increase in the migraine headaches to which she was susceptible, during the period from April through early June, the migraines were reasonably responsive to treatments provided by her physicians.

57.     But because she was the only person whom Dillon had singled out for this type of treatment, Stillo began to believe that Dillon's conduct was motivated by her age, particularly since it was ongoing, since it was not directed toward any other, younger employees, and because upon reflection, Stillo had noticed a number of older employees separating from Walgreens without commenting that they were retiring or had found other employment.

58.     On June 15, 2021, though there had been no further disciplinary incidents, Dillon handed Stillo a Performance Improvement Plan ("PIP") that fabricated a series of minor disciplinary incidents both before and after February 26, 2021.

59.     The PIP was facially non-compliant with the Walgreens' PDP, which provides for the following steps: (1) verbal counseling, (2) written warning, (3) final written warning, (4) termination.  The PDP requires that all steps be documented.  After each step, a failure to improve *after* the discipline is implemented and the employee is

12

counseled can result in further discipline, including potential termination. Stillo had never been disciplined under the PDP before, and therefore any PIP was premature, and should have been preceded by verbal counseling and a written warning.

60.    The PIP was also substantively false. The PIP purports to be based on lack of performance and states that Dillon had meetings with Stillo on January 19, 2021, February 23, 2021, March 16, 2021, March 29, 2021, April 6, 2021, April 13, 2021, May 11, 2021, and May 18, 2021, about performance problems.

61.    Upon information and belief, none of those meetings occurred, and if an informal meeting *did* occur on one of those dates, it was a casual workplace interaction, not contemporaneously documented, and not discipline under the PDP.

62.    The only actual meetings that Dillon and Andolfo had with Stillo to discuss performance metrics and behavior had been the disastrous ones on March 8, 2021, and May 20, 2021, neither of which was even mentioned in the PIP. Additionally, neither Dillon nor Andolfo ever informed Stillo that either of those meetings constituted discipline under the PDP or that she was at risk of being put on a PIP. Furthermore, Stillo was never given any documentation of discipline directed at her as required by the PDP.

63.    Upon information and belief, Dillon, with either the actual or constructive knowledge of Walgreen's, fabricated a record of prior discipline so that the PIP would appear to comport with Walgreens' PDP, that states that a PIP is *only* to be used "after verbal counseling has not resulted in improved and sustained performance."

64.    Though the PDP does permit managers to skip steps and either terminate an employee or place them on a PIP for severe conduct, such acceleration of the PDP is reserved for conduct such as sleeping on the job, destruction of company property, and

13

violations of safety rules.  However, in other cases where similar minor infractions had occurred, such as Liggins raising her voice to Stillo and Haydu falsifying disciplinary records, employees were simply transferred to another store, and were not disciplined at all.

65.     Upon information and belief, the false statements contained in the PIP were not a proper application of the PDP, or even an acceleration of PDP steps because of insubordinate conduct, but rather a pretext attempt to force Stillo to leave her employment or justify her termination.  The statements within the PIP themselves, even if they *had* been true, demonstrate that no acceleration of the PDP was warranted under the PIP.

66.     Reading this false information, which resembled the pretextual FWW from 2019, Stillo began to believe that Dillon and Andolfo were fabricating a paper trail to force her to quit or justify terminating her, and she found herself under an enormous amount of stress and strain and lost her temper as her migraine symptoms flared.

67.     Dillon began to goad Stillo by continuing to berate her instead of calmly and professionally trying to discuss the PIP with Stillo, in an apparent attempt to trigger Stillo to lose her temper.

68.     Within minutes both Dillon and Stillo were raising their voices with one another, and both used foul language, including using the "f" word.

69.     In prior interactions between Dillon and Stillo, Dillon had condoned the use of this type of language between the two of them by never reprimanding her for it, never changing his own conduct in regularly using this language, and even affirmatively saying in one text message to Stillo, "Not everyone can say FU like we can."

70.     Because her disabling migraine symptoms were flaring up, Stillo had to leave the room abruptly before the meeting was over, knowing that any further interaction with Dillon could induce another severe migraine attack that could take days to recover from.

71.     Though the PIP was extraordinarily stressful for Stillo, the tenor of the conversation between her and Dillon was no different than any of their previous conflicts. Dillon did not make any statements indicating that Stillo's conduct during the meeting would warrant further discipline, suspension, or termination.

72.     Following this meeting, Stillo reflected upon the number of employees in their 40s and 50s who had been forced out based on unfair or unequally enforced disciplinary measures, and realizing that she knew of at least two other such employees as to whom she believed this to be the case, she sought legal counsel to investigate whether she and other older employees were being discriminated against because of their age.

73.     On June 18, 2021, Stillo's attorney sent a letter to Andolfo asking him to reduce the subject of any meeting with Stillo to writing and for counsel to be copied on those writings.

74.     Between June 15, 2021, and June 28, 2021, Stillo did not receive any further documentation of additional supposed discipline.

75.     On June 28, 2021, Stillo, through a letter from her counsel, informed Walgreens, Dillon, and Andolfo, that she believed that Walgreens had discriminated against her, and potentially other employees, because of their age. **(Exhibit 3)**

76.     On June 29, 2021, two weeks after the unwarranted PIP was imposed on Stillo, *despite no further discipline being issued against Stillo*, and after weeks of isolation

15

and ostracization in the workplace as her migraine symptoms became more and more severe due to stress, Andolfo and Dillon once again confronted Stillo and placed her on an unpaid suspension of indefinite length, claiming that it was for "unprofessional conduct."

77.     Stillo was not given *any* information as to how long her suspension might last.

78.     Upon information and belief, Walgreens would not have placed Stillo on suspension if she had not informed them that she was seeking counsel to determine whether she had a claim for discrimination based on age, and the decision to place her on suspension was an act of retaliation for making a complaint about unlawful age discrimination in violation of the CT FEPA.

79.     Being placed on suspension with no information immediately after she had been placed on an unwarranted PIP, yelled at, humiliated, and then suspended after 30 years of devoted service, triggered a stress-induced migraine episode for Stillo, and she needed to seek treatment and recuperate before she could safely discharge her duties as a Pharmacy Manager.

80.     On July 1, 2021, Stillo applied for disability leave, and claim number 510632714410001 (short term) and claim number C106300204500157AA (long term) confirmation letters were issued.

81.     At the time that Stillo applied for disability leave, she was an employee of Walgreens.

82.     At the time that Stillo applied for disability leave, Stillo was disabled within the meaning of Conn. Gen. Stat. §46a-41(15) and under 28 CFR 25.108 as the symptoms of her migraine headaches affected her neurological system, resulting in a physical or

mental impairment that substantially limited Stillo's ability to perform major life activities including performing manual tasks, manipulating small objects, seeing, hearing, sleeping, standing, counting, lifting bending, concentrating, thinking, communicating, interacting with others, and working.  As such, Stillo was eligible for disability leave.

83.    On July 3, 2021, and July 5, 2021, Andolfo called Stillo, even though she was ostensibly on medical leave, but Stillo was unable to answer the phone on either occasion.  Andolfo did not leave a message.

84.    On July 6, 2021, Andolfo left Stillo a voicemail message terminating her employment, "effective immediately."

85.    On July 12, 2021, Stillo received correspondence from Walgreens stating that her termination had been *backdated* to June 29, 2021.  **Exhibit 4.**

86.    Upon information and belief, Walgreens would not have terminated Stillo based on the PIP alone, because it did not place her on unpaid leave until after she hired an attorney and put Walgreens on notice of her good faith belief that it had engaged in age discrimination in violation of the CT FEPA.

87.    Upon information and belief, Walgreens compounded its retaliatory suspension of Stillo by terminating her on July 6, 2021, in retribution for seeking disability leave, then backdating the date of her termination on her medical leave request documentation with the intent to interfere with her right to take disability leave under the CT FMLA and the FMLA.

88.    In a final act of retaliation, Walgreens did not produce Stillo's personnel file upon receiving a written request and release from Stillo for such file.  The request was made on August 11, 2021, and pursuant to Conn. Gen. Stat. § 31-128b(b), no personnel

file was produced by August 25, 2021, which is the statutory deadline for the production of such file.

89.     Stillo notified Walgreens again of its failure to produce the file by filing a complaint with the CHRO on September 22, 2021, but again Walgreens did not provide Stillo with a copy of her personnel file, a second violation of its statutory obligation to do so.

## LEGAL CLAIMS

### COUNT I
### RETALIATION AGAINST STILLO IN VIOLATION OF
### 29 U.S.C. §§ 621-634 (the "ADEA")

90.     Stillo incorporates by reference all preceding allegations in this Complaint.

91.     Stillo made a complaint to Walgreens about unlawful practices constituting age discrimination.  At all times, Stillo's good faith belief that unlawful age discrimination was occurring at Walgreens was both subjectively and objectively reasonable.

92.     Instead of taking Stillo's complaints at face value and investigating whether they had merit, as required by law, Walgreen's undertook to level discipline against Stillo based on fabricated offenses, and in a fashion that was contrary to its established policies, procedures, and practices.

93.     Additionally, Walgreens imposed a PIP on Stillo, again without cause and in violation of the PDP, which requires documentation of verbal warnings prior to the imposition of a PIP.

94.     Walgreens put Stillo on suspension, without pay, for an indefinite period of time, without cause, and in violation of the PDP.

18

95.     Walgreens terminated Stillo, in retaliation for her complaints, and for her submission of an application to take disability leave, though it was at all times aware that Stillo suffered from stress-induced migraine headaches, and had an obligation to investigate the basis for her disability application if it had a reasonable belief that the application was fraudulent.

96.     Walgreens aided, abetted, incited, compelled, and/or coerced the unlawful employment practices described herein, and is responsible for them.

97.     Walgreens' conduct in this regard was willful and/or in reckless disregard to the Plaintiff's right to a workplace that is free from retaliation.

98.     As a result of the Walgreens' unlawful retaliation, the Plaintiff has and will continue to suffer economic loss.

99.     As a result of the Walgreens' retaliation, the Plaintiff has and will continue to suffer economic loss, as well as emotional distress.

100.     As a result of Walgreens' unlawful conduct as described herein, Stillo has suffered from severe anxiety, stress, humiliation, emotional distress, embarrassment, and mental anguish.

101.     Upon information and belief, Walgreens engaged in the unlawful conduct described herein with reckless indifference and a conscious disregard for Stillo's rights.


**COUNT II**
**RETALIATION AGAINST STILLO**
**IN VIOLATION OF THE CFEPA, CONN. GEN. STAT. § 46a-60(b)(4)**

102.     Stillo incorporates by reference all preceding allegations in this Complaint.

103.    Walgreens violated Conn. Gen. Stat. § 46a-60(b)(4) by imposing discipline upon Stillo, and ultimately discharging Stillo from her employment when she made a complaint about unlawful practices constituting age discrimination.  At all times, Stillo's good faith belief that unlawful age discrimination was occurring at Walgreens was both subjectively and objectively reasonable.

104.    Stillo made a complaint to Walgreens based on a good faith subjectively and objectively reasonable belief that it had violated state and federal statutes prohibiting age discrimination in the workplace, and that she herself was being targeted by those policies.

105.    Instead of taking Stillo's complaints at face value and investigating whether they had merit, as required by law, Walgreen's undertook to level discipline against Stillo based on fabricated offenses, and in a fashion that was contrary to its established policies, procedures, and practices.

106.    Additionally, Walgreens imposed a PIP on Stillo, again without cause and in violation of the PDP, which requires documentation of verbal warnings prior to the imposition of a PIP.

107.    Walgreens put Stillo on suspension, without pay, for an indefinite period of time, without cause, and in violation of the PDP. Upon information and belief, Walgreens would not have suspended or terminated Ms. Stillo based on the PIP alone, because it did not place her on unpaid leave until after she hired an attorney and put Walgreens on notice of her good faith belief that it had engaged in age discrimination in violation of the CT FEPA.

108.    Upon information and belief, Walgreens would not have terminated Ms. Stillo based on the PIP alone, because it did not place her on unpaid leave until after she hired an attorney and put Walgreens on notice of her good faith belief that it had engaged in age discrimination in violation of the CT FEPA.

109.    Walgreens aided, abetted, incited, compelled, and/or coerced the unlawful employment practices described herein, and is responsible for them.

110.    The Walgreens' conduct in this regard was willful and/or in reckless disregard to the Plaintiff's right to a workplace that is free from retaliation.

111.    As a result of the Walgreens' unlawful retaliation, the Plaintiff has and will continue to suffer economic loss.

112.    As a result of the Walgreens' retaliation, the Plaintiff has and will continue to suffer economic loss, as well as emotional distress.

113.    As a result of Walgreens' unlawful conduct as described herein, Stillo has suffered from severe anxiety, stress, humiliation, emotional distress, embarrassment, and mental anguish.

114.    Upon information and belief, Walgreens engaged in the unlawful conduct described herein with reckless indifference and a conscious disregard for Stillo's rights.

**COUNT III**
**INTERFERENCE WITH AND RETALIATION FOR**
**SEEKING MEDICAL LEAVE**
**IN VIOLATION OF THE FMLA, 29 CFR §825.220(a)-(d)**

115.    Stillo incorporates by reference all preceding allegations in this Complaint.

116.    At all relevant times, Stillo was disabled within the meaning of 28 CFR 25.108 as the symptoms of her migraine headaches affected her neurological system, resulting in a physical or mental impairment that substantially limited Ms. Stillo's ability to perform major life activities including performing manual tasks, manipulating small objects, seeing, hearing, sleeping, standing, counting, lifting bending, concentrating, thinking, communicating, interacting with others, and working.  As such, Ms. Stillo was eligible for disability leave.

117.    Stillo's migraines became severe and disabling as a result of her being placed on indefinite suspension without pay on June 29, 2021.

118.    Because she did not know how long it would be before she was asked to return to work, Stillo applied for disability leave on July 1, 2021.

119.    Though she had been placed on suspension on June 29, 2021, she remained employed by Walgreens on July 1, 2021.

120.    On July 6, 2021, Mr. Andolfo left Ms. Stillo a voicemail message terminating her employment, "effective immediately."

121.    On July 12, 2021, Ms. Stillo received correspondence from Walgreens stating that her termination had been *backdated* to June 29, 2021, and denying her request for disability leave because as of July 1, 2021 she was ostensibly no longer an employee.

122.    Walgreens was at all times aware that Stillo suffered from stress-induced migraine headaches and had an obligation to investigate the basis for her disability application if it had a reasonable belief that the application was fraudulent.

123.    Upon information and belief, the decision to backdate Stillo's termination date was in retaliation for her application for disability leave and was intended to prevent her from taking disability leave.

124.    Walgreens aided, abetted, incited, compelled, and/or coerced the unlawful employment practices described herein, and is responsible for them.

125.    The Walgreens' conduct in this regard was willful and/or in reckless disregard to the Plaintiff's right to a workplace that is free from retaliation.

126.    As a result of the Walgreens' unlawful retaliation, the Plaintiff has and will continue to suffer economic loss.

127.    As a result of the Walgreens' retaliation, the Plaintiff has and will continue to suffer economic loss, as well as emotional distress.

128.    As a result of Walgreens' unlawful conduct as described herein, Stillo has suffered from severe anxiety, stress, humiliation, emotional distress, embarrassment, and mental anguish.

129.    Upon information and belief, Walgreens engaged in the unlawful conduct described herein with reckless indifference and a conscious disregard for Stillo's rights.

**COUNT IV**
**INTERFERENCE WITH AND RETALIATION FOR**
**SEEKING MEDICAL LEAVE**
**IN VIOLATION OF THE CTFMLA, CONN. GEN. STAT. §35-61pp**

130.    Ms. Stillo was disabled within the meaning of Conn. Gen. Stat. §46a-41(15) and as the symptoms of her migraine headaches affected her neurological system, resulting in a physical or mental impairment that substantially limited Ms. Stillo's ability to perform

major life activities including performing manual tasks, manipulating small objects, seeing, hearing, sleeping, standing, counting, lifting bending, concentrating, thinking, communicating, interacting with others, and working.  As such, Ms. Stillo was eligible for disability leave.

131.   Stillo's migraines became severe and disabling as a result of her being placed on indefinite suspension without pay on June 29, 2021.

132.   Because she did not know how long it would be before she was asked to return to work, Stillo applied for disability leave on July 1, 2021.

133.   Though she had been placed on suspension on June 29, 2021, she remained employed by Walgreens on July 1, 2021.

134.   On July 6, 2021, Mr. Andolfo left Ms. Stillo a voicemail message terminating her employment, "effective immediately."

135.   On July 12, 2021, Ms. Stillo received correspondence from Walgreens stating that her termination had been backdated to June 29, 2021, and denying her request for disability leave because as of July 1, 2021 she was ostensibly no longer an employee.

136.   Walgreens was at all times aware that Stillo suffered from stress-induced migraine headaches and had an obligation to investigate the basis for her disability application if it had a reasonable belief that the application was fraudulent.

137.   Upon information and belief, the decision to backdate Stillo's termination date was in retaliation for her application for disability leave and was intended to prevent her from taking disability leave.

138.   Walgreens aided, abetted, incited, compelled, and/or coerced the unlawful employment practices described herein, and is responsible for them.

139.    The Walgreens' conduct in this regard was willful and/or in reckless disregard to the Plaintiff's right to a workplace that is free from retaliation.

140.    As a result of the Walgreens' unlawful retaliation, the Plaintiff has and will continue to suffer economic loss.

141.    As a result of the Walgreens' retaliation, the Plaintiff has and will continue to suffer economic loss, as well as emotional distress.

142.    As a result of Walgreens' unlawful conduct as described herein, Stillo has suffered from severe anxiety, stress, humiliation, emotional distress, embarrassment, and mental anguish.

143.    Upon information and belief, Walgreens engaged in the unlawful conduct described herein with reckless indifference and a conscious disregard for Stillo's rights.

**COUNT V**
**FAILURE TO PRODUCE STILLO'S PERSONNEL FILE UPON REQUEST**
**IN VIOLATION OF CONN. GEN. STAT. § 31-128b(b)**

144.    On August 11, 2021, Stillo requested a copy of her personnel file in writing.

145.    The request was acknowledged by Walgreens, and Stillo provided a signed authorization in response to a request from Walgreens.

146.    Pursuant to Conn. Gen. Stat. § 31-128b(b), Walgreens was obliged to provide Stillo with a copy of her personnel file within ten (10) business days of receiving such request.

147.    However, no copy of the file was received on August 25, 2021, nor on any date after that.

148.    Stillo made another request for that file by filing a complaint with the CHRO outlining Walgreens' failure to provide her file, but Walgreens never provided a copy of her personnel file.

149.    To date, Stillo has received no copy of her personnel file from Walgreens.

**WHEREFORE**, the Stillo respectfully prays that this Court award the following damages from Walgreens for each count herein alleged:

    a.   Economic damages;

    b.   Compensatory damages;

    c.   Statutory damages;

    d.   Punitive damages for the Walgreens' willful and/or recklessly indifferent conduct;

    e.   Attorneys' fees and costs; and,

    f.   Any other remedy that may appear to be just and proper.

Respectfully Submitted,

Maya Murphy, P. C.

By:    _/s/ Joseph C. Maya, Esq._
Joseph C. Maya, Esq. (17742)
Attorneys for the Plaintiff
266 Post Road East
Westport, CT 06880
Tel. (203) 221-3100
Fax (203) 221-3199
jmaya@mayalaw.com

**EXHIBIT 1**

# STATE OF CONNECTICUT
# COMMISSION ON HUMAN RIGHTS AND OPPORTUNITIES

Rosa Stillo
**COMPLAINANT**

CHRO No. 2220093

vs.

EEOC No. 16A-2021-01452

Walgreens Pharmacy
**RESPONDENT**

## RELEASE OF JURISDICTION

The Commission on Human Rights and Opportunities hereby releases its jurisdiction over the above-identified complaint. The Complainant is authorized to commence a civil action in accordance with CONN. GEN. STAT. § 46a-100 against the Respondent in the Superior Court for the judicial district in which the discriminatory practice is alleged to have occurred, in which the Respondent transacts business or in which the Complainant resides. If this action involves a state agency or official, it may be brought in the Superior Court for the judicial district of Hartford.

A copy of any civil action brought pursuant to this release must be served on the Commission at ROJ@ct.gov or at 450 Columbus Blvd., Suite 2, Hartford, CT 06103 at the same time all other parties are served. Electronic service is preferred. **THE COMMISSION MUST BE SERVED BECAUSE IT HAS A RIGHT TO INTERVENE IN ANY ACTION BASED ON A RELEASE OF JURISDICTION PURSUANT TO CONN. GEN. STAT. § 46a-103.**

The Complainant must bring an action in Superior Court within 90 days of receipt of this release and within two years of the date of filing the complaint with the Commission unless circumstances tolling the statute of limitations are present.

**DATE:** December 16, 2021

Tanya A. Hughes, Executive Director

Service:
Complainant's counsel:  risraely@mayalaw.com
Respondent's counsel:  rjaziri@morganbrown.com

.

**EXHIBIT 2**

EEOC Form 161 (11/2020)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

### DISMISSAL AND NOTICE OF RIGHTS

| | |
|---|---|
| To:   **Rosa ("Rose") Stillo**<br>**63 Revere Lane**<br>**Fairfield, CT 06824** | From:   **Boston Area Office**<br>**John F. Kennedy Fed Bldg**<br>**15 New Sudbury Street, Room 475**<br>**Boston, MA 02203** |

☐   *On behalf of person(s) aggrieved whose identity is CONFIDENTIAL (29 CFR §1601.7(a))*

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| **16A-2021-01452** | **Amon L. Kinsey, Jr.,**<br>**Supervisory Investigator** | **(617) 865-3672** |

## THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:

☐   The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

☐   Your allegations did not involve a disability as defined by the Americans With Disabilities Act.

☐   The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

☐   Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge

☐   The EEOC issues the following determination: The EEOC will not proceed further with its investigation, and makes no determination about whether further investigation would establish violations of the statute. This does not mean the claims have no merit. This determination does not certify that the respondent is in compliance with the statutes. The EEOC makes no finding as to the merits of any other issues that might be construed as having been raised by this charge.

☐   The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

☒   Other *(briefly state)*      **Charging Party is pursuing claims in another forum.**

### - NOTICE OF SUIT RIGHTS -
*(See the additional information attached to this form.)*

**Title VII, the Americans with Disabilities Act, the Genetic Information Nondiscrimination Act, or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit **must be filed <u>WITHIN 90 DAYS</u> of your receipt of this notice**; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred <u>more than 2 years (3 years)</u> before you file suit may not be collectible.**

On behalf of the Commission

*Feng K. An, (signature)*                                                                    January 13, 2022

**Feng K. An,**                                                                                  *(Date Issued)*
**Area Office Director**

Enclosures(s)

cc:

**WALGREENS PHARMACY SERVICES MIDWEST,**
**LLC**
**880 Post Road E**
**Westport, CT 06880**

Enclosure with EEOC
Form 161 (11/2020)

## INFORMATION RELATED TO FILING SUIT
## UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court <u>under Federal law</u>.*
*If you also plan to sue claiming violations of State law, please be aware that time limits and other*
*provisions of State law may be shorter or more limited than those described below.)*

**PRIVATE SUIT RIGHTS** -- **Title VII of the Civil Rights Act, the Americans with Disabilities Act (ADA), the Genetic Information Nondiscrimination Act (GINA), or the Age Discrimination in Employment Act (ADEA):**

In order to pursue this matter further, you must file a lawsuit against the respondent(s) named in the charge **within 90 days** of the date you *receive* this Notice. Therefore, you should keep a record of this date. Once this 90-day period is over, your right to sue based on the charge referred to in this Notice will be lost. If you intend to consult an attorney, you should do so promptly. Give your attorney a copy of this Notice, and its envelope or record of receipt, and tell him or her the date you received it. Furthermore, in order to avoid any question that you did not act in a timely manner, it is prudent that your suit be filed **within 90 days of the date this Notice was** *issued* to you (as indicated where the Notice is signed) or the date of the postmark or record of receipt, if later.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction. (Usually, the appropriate State court is the general civil trial court.) Whether you file in Federal or State court is a matter for you to decide after talking to your attorney. Filing this Notice is not enough. You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief. Your suit may include any matter alleged in the charge or, to the extent permitted by court decisions, matters like or related to the matters alleged in the charge. Generally, suits are brought in the State where the alleged unlawful practice occurred, but in some cases can be brought where relevant employment records are kept, where the employment would have been, or where the respondent has its main office. If you have simple questions, you usually can get answers from the office of the clerk of the court where you are bringing suit, but do not expect that office to write your complaint or make legal strategy decisions for you.

**PRIVATE SUIT RIGHTS** -- **Equal Pay Act (EPA):**

EPA suits must be filed in court within 2 years (3 years for willful violations) of the alleged EPA underpayment: back pay due for violations that occurred **more than 2 years (3 years) before you file suit** may not be collectible. For example, if you were underpaid under the EPA for work performed from 7/1/08 to 12/1/08, you should file suit before 7/1/10 – *not* 12/1/10 -- in order to recover unpaid wages due for July 2008. This time limit for filing an EPA suit is separate from the 90-day filing period under Title VII, the ADA, GINA or the ADEA referred to above. Therefore, if you also plan to sue under Title VII, the ADA, GINA or the ADEA, in addition to suing on the EPA claim, suit must be filed within 90 days of this Notice <u>and</u> within the 2- or 3-year EPA back pay recovery period.

**ATTORNEY REPRESENTATION** -- **Title VII, the ADA or GINA:**

If you cannot afford or have been unable to obtain a lawyer to represent you, the U.S. District Court having jurisdiction in your case may, in limited circumstances, assist you in obtaining a lawyer. Requests for such assistance must be made to the U.S. District Court in the form and manner it requires (you should be prepared to explain in detail your efforts to retain an attorney). Requests should be made well before the end of the 90-day period mentioned above, because such requests do <u>not</u> relieve you of the requirement to bring suit within 90 days.

**ATTORNEY REFERRAL AND EEOC ASSISTANCE** -- **All Statutes:**

You may contact the EEOC representative shown on your Notice if you need help in finding a lawyer or if you have any questions about your legal rights, including advice on which U.S. District Court can hear your case. If you need to inspect or obtain a copy of information in EEOC's file on the charge, please request it promptly in writing and provide your charge number (as shown on your Notice). While EEOC destroys charge files after a certain time, all charge files are kept for at least 6 months after our last action on the case. Therefore, if you file suit and want to review the charge file, **please make your review request <u>within 6 months</u> of this Notice**. (Before filing suit, any request should be made within the next 90 days.)

*IF YOU FILE SUIT, PLEASE SEND A COPY OF YOUR COURT COMPLAINT TO THIS OFFICE.*

**EXHIBIT 3**



266 Post Road East
Westport, CT 06880
203.221.3100
203.221.3199/fax

261 Madison Avenue
26th Floor
New York, NY 10016
212.682.5700
212.682.5797/fax
www.mayalaw.com

June 28, 2021

**VIA EMAIL & CERTIFIED MAIL**

Matthew Andolfo
Walgreens District Manager
148 Eastern Blvd., Suite 400
Glastonbury, CT 06033
Email:  Matthew.Andolfo@Walgreens.com

Manar Kayal
Director, Pharmacy & Retail Operations
148 Eastern Blvd., Suite 400
Glastonbury, CT 06033
Email:  Maynar.Kayal@Walgreens.com

**Re:**   <u>Stillo, Rose</u>

As you know, this firm represents Ms. Rose Stillo regarding her employment with Walgreens Pharmacy.  Rose has been employed as a pharmacist at Walgreens for the past three (3) decades where she has shown to be a valuable and committed member of her pharmaceutical team.  Ms. Stillo's hard work paid off when she was promoted to Pharmacy Manager.

During her tenure at Walgreen's, and now as Pharmacy Manager, Ms. Stillo has been responsible for various tasks including, but not limited to, overseeing the operations of the pharmacy department, ensuring customers are prescribed the correct medicine, ensuring the pharmacy complies with federal and state regulations, preparing drugs and executing prescription orders for collection or delivery, and administering COVID-19 vaccines, all while complying with Walgreen's various policies and procedures.

As you are aware, this past year has been tremendously challenging, particularly for those in the medical and pharmaceutical industries as the world faced the global pandemic of COVID-19.  Despite the challenges including a substantially increased workload resulting from an influx



of thousands of COVID-19 vaccine customers, Ms. Stillo continues to persevere and thrive in her position.

Despite her hard work and longstanding commitment to Walgreen's and Walgreen's customers, Ms. Stillo began to experience pushback from management who repeatedly refuse to assist her when she seeks support.  Ms. Stillo has asked both Steve Dillon, Walgreen's Store Manager, and Matthew Andolfo, District Manager, in May of 2020 to allow a front-end employee to help with technician adherence calls as she had experienced in the past.  This request was denied.  Ms. Stillo then requested that the store managers do "CODE GREENS" every morning mandating store managers to spend their first two (2) hours of the day in pharmacy enabling adherence calls to get done and ensure the pharmacy does not become backed up for the day.  This did not occur.  Still persevering in her quest for staffing assistance, Ms. Stillo asked that Steven Dillon follow-up with applications to staff the pharmacy according to the ongoing needs.  These applications were not followed up on and the pharmacy remained understaffed.  Ms. Stillo even observed Mr. Dillon become an immunizer in an apparent effort to assist in the demand, yet he failed to administer any vaccines after the very first day.

Despite her repeated efforts to seek assistance to enable the pharmacy to operate smoothly and to serve Walgreen's customers in the most effective and efficient way, Ms. Stillo continued to receive pushback from management.  An advocate for fairness and change, she took advantage of Walgreen's Open-Door Policy, a policy in place "companywide for the Walgreen's Family of Companies team members".  This policy expressly states that is it intended to provide "…each team member the opportunity to seek a review of suggestions, questions, concerns, or differences of opinion related to his or her work situation and/or company matters."  The policy goes on the assure employees that "[t]eam members who utilize this policy may do so without fear of reprisal."

On June 15th, 2021, Ms. Stillo was shocked when presented with a Performance Improvement Plan ("PIP") by Mr. Dillon with no warning whatsoever, verbal or otherwise.  The plan specifically stated therein that a PIP is *only* to be used "after verbal counseling that has not resulted in improved and sustained performance".  Furthermore, the PIP contained various entries that were factually erroneous alleging that meetings had taken place with Ms. Stillo



including meetings on January 19, 2021, February 23, 2021, March 16, 2021, March 29, 2021, April 6, 2021, April 13, 2021, May 11, 2021, and May 18, 2021, even going so far as to describe the communications during said meeting.

Ms. Stillo has become increasingly concerned with the recent series of events seemingly directed solely at her, coupled with the recent history of employee turnover of senior staff members. In her mid-fifties, she cannot help but to be concerned that the aforementioned concerns are a direct result of her age, longevity – and salary, with the company. She is concerned that the events have been orchestrated to push her out. On June 18, 2021, when approached by Walgreen's management and one (1) unknown Walgreen's employee to have a private conversation, you can understand that in light of the foregoing, Ms. Stillo was fearful of what might transpire.

As Ms. Stillo has retained counsel, all communications regarding the terms of her employment should be directed to my office. She should not be contacted directly regarding the contents of this letter. Please contact me at your earliest convenience if it is your intention to have further discussions with Ms. Stillo regarding the content of this letter. Thank you for your attention to this matter.

Tori Ludwig, Esq. (433493)
MAYA MURPHY, P.C.
266 Post Road East
Westport, CT 06880
(203) 221-3100
Firm Juris No. 415476
tludwig@mayalaw.com

**EXHIBIT 4**

7/27/2021                                    Gmail - RE: C106300204500157AA, 510632714410001

 Gmail



Rose Stillo <rstillo@gmail.com>

## RE: C106300204500157AA, 510632714410001

1 message

**Goyette, Denise** <Denise.Goyette@sedgwick.com>                      Mon, Jul 12, 2021 at 9:35 AM
To: Rose Stillo <rstillo@gmail.com>

Yes the claim was denied,  that is the date they confirmed and it showing in the system if that is incorrect Walgreens
would need to contact us with the corrected date.


Thank you



**From:** Rose Stillo <rstillo@gmail.com>
**Sent:** Monday, July 12, 2021 4:57 AM
**To:** Goyette, Denise <Denise.Goyette@sedgwick.com>
**Subject:** C106300204500157AA, 510632714410001


CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless
you recognize the sender and know the content is safe.

Hi Denise,


I believe if I understand correctly that the LOA claims were denied. I also found out Friday that Walgreens put in a
termination date for me of June 29th.  This is NOT correct.  The termination date was actually 7/6/21,  after the claim was
underway.


Anyway,  I thought  you should know for your records that the actual termination date was 7/6 . Thank you with your help
with everything anyway.


Rose

Any personal data acquired, processed or shared by us will be lawfully processed in line with applicable data protection
legislation. If you have any questions regarding how we process personal data refer to our Privacy Notice
https://www.sedgwick.com/global-privacy-policy. Any communication including this email and files/attachments
transmitted with it are confidential and are intended solely for the use of the individual or entity to whom they are
addressed. If this message has been sent to you in error, you must not copy, distribute or disclose of the information it
contains and you must notify us immediately (contact is within the privacy policy) and delete the message from your
system.